Thank you. May it please the Court, Counsel. Good afternoon. My name is Cori Harber and it is my privilege here today to appear on behalf of Mr. Lok Lau, who joins us in the courtroom. I would like to reserve three minutes for rebuttal with the Court's permission. We are expecting some justices from the Thailand Supreme Court. They're in a building. Oh. So they may come in. Okay. That would be great. Okay. I'm sure the Court is well aware and familiar with the facts surrounding the case, so I would like to just proceed into what I feel are some of the more important issues. Without waiving any of the arguments that were presented relating to Mr. Lau's Title VII race, national origin, and retaliation claims, I'd like to focus my comments today on the issues related to the Rehabilitation Act. It's undisputed in the record that Mr. Lau is disabled, as that term is defined by the Thus, in viewing the evidence, in the light most favorable to the non-movement, the record before the Court is replete with genuine issues of material fact that the acts committed by Mr. Lau were causally connected to his disability and that he was, in fact, terminated because of this disability, that he was otherwise qualified for the position as a special agent, and that a reasonable accommodation did, in fact, exist but was denied. I realize that disability has been conceded at this point, but could you provide me with your analysis on where you think that will go at trial? I guess what I'm really interested in is what's the, he claims disability by virtue of depression, post-traumatic stress disorder, and a major life activity that it affects is what? Basically, I believe it affects his ability to function as an agent. Now, getting into the otherwise qualified, which I'm assuming that's where you're going, my analysis is that he was, in fact, otherwise qualified. There's no doubt about that. But once the disability manifested itself, he thereby sought, asked for relief in the form of psychiatric and or psychological counseling. This was denied to him, despite the fact that the FBI was well aware and had actually recommended that it be provided to him. But I guess to carry that, to go back again a step, the major lack, your contention is he can't perform his job at all at present because his judgment is so impaired by the disability. Is that what? I don't think he can't. No, I don't think so. I think that once he, if he were provided the reasonable accommodation, in this instance, a leave of absence in order to address those issues, I think that his doctor's reports, even though I realize the trial court did strike them due to serious attorney error at the trial level, I think that there was some indication that with the proper counseling, medication, therapy, he could, in fact, be rehabilitated to the point that he could perform those duties. That it was the need to address his serious post-traumatic stress disorder, which occurred from his, I guess the record reflects seven years of a deep undercover assignment that was never dealt with. Once that was allowed to be dealt with and he received treatment according to that, he would then be able to perform the duties as a special agent. Okay. Why don't you proceed with your otherwise qualified? I'm sorry? Why don't you proceed with your otherwise qualified? Otherwise qualified. I think that, as I said, there's no definition, I mean, there's no dispute that he was initially qualified for the position. As you know, as long as he is an individual who, with or without reasonable accommodation, could have performed the essential duties of the job, he would have been considered qualified. Suppose the post-traumatic stress syndrome caused him to have a nervous tick with his trigger finger. I'm sorry? Suppose that the post-traumatic syndrome, the effect of it caused him to have a nervous tick with his trigger finger and it would cause him to fire his weapon in inappropriate circumstances. Right. Would you make the same argument? I don't know that I would make the same argument. I do know that there obviously was some question about that, as his gun and his badge had both been taken away from him at some point prior to him, I guess, some point prior to the FBI doctors recommending that he take a leave of absence in order to address these concerns. So certainly that would be a different set of facts than what we have here today. I think what we're basically arguing is that based on his stress, which I know that the government is not going to concede that it was caused by the undercover assignment and the attendant stressors therefrom, I think it was caused by that and I think the FBI recognized that as early as 1990 and did nothing to address that concern. Instead, they, for the first shoplifting incident, they did suspend him for 14 days, allowed him to continue for another four months in that undercover situation, which is no doubt very stressful. And then once he had completed that assignment, did nothing to address the concerns of an agent who had been undercover for such a long period of time. I think the record reflects that the only help that they provided him was five days in the undercover safeguard unit. And there are memos within the record that indicate that this was clearly against the policy and procedures, that someone who had been placed in such a serious and stressful situation should have been given whatever therapy and services that he so desired and that the Bureau actually recommended such a de-stressor period after such an assignment. How much time passed from the end of his undercover assignments approximately until the hearing that he had following the second incident that led to the removal of his security clearance? The, are you talking about the review of the doctor from John Vale? I believe the initial, the record reflects that he completed his undercover duties, I believe, in 1993. The first fitness for duty evaluation was requested in 1998 by his supervisors who had, I guess, observed some abnormal behavior on his part and requested a fitness for duty. And it wasn't until 1999, I believe, that he was actually under review trying to get his top secret security clearance reinstated. Actually, that was 2000, I'm sorry. Yeah, I'm looking at a December 13, 2000. Right, from John Vale. Yeah, from John Vale, and it reflects a meeting that the Access Review Committee had with him in July of 2000? Correct. Correct. This is approximately seven years after the last undercover work? That is correct. And is it accurate, does the memo accurately reflect that at that hearing he denied shoplifting? I think that they Denied the second incident that had ever happened? I believe that's what the record reflected. Even though there was a video? Correct. A video tape of it? Correct. And I believe in John Vale's memo, he indicates that, well, in fact, he did deny it, that this was symptomatic of someone who was suffering such post-traumatic stress disorder. And I think Mr. Vale's letter, if nothing else, provides numerous issues of fact from which a jury could determine that the FBI completely mishandled Mr. Lyle's situation. He stated that despite Mr. Lyle's requests for such help, it was never given. He obviously affirmed the revocation of the top-secret clearance because that was the only issue before him, but I think he did not mince his words in finding that the FBI had mishandled his psychological requests for help. You know, I did a lot of work with FBI agents when I was a prosecutor. Right. I have terrific respect for the Bureau, and I think you have some understanding of both its high and low points and its weaknesses and the like. Right. And there was, as a prosecutor, there were a lot of things you could tolerate from an FBI agent, whether they were manizing, whatever the equivalent is. But the one thing, no matter what they did, whether they were an evidence analyst, a field agent, a fingerprint analysis, someone who simply went through intelligence reports, was to candidly tell people the truth about what they had done and what they had not done. If you don't do that with a prosecutor, cases get lost, dangerous people might go free, or, conversely, innocent people might get convicted. Right. And to me, that's the disturbing thing about this. Not that someone who had undergone a lot of stress might shoplift, but that they not only wouldn't report it, even after the long passage of time, or would deny it in the face of concrete evidence that it actually occurred. In response to that, I would just say, as an indication of his first seven years with the Bureau, his life was nothing but a lie. He was taught to lie. He had an alternate identity. He was deep, deep undercover, so much so that, as the Court is well aware, a lot of the documents surrounding this case were, I guess, initially not cleared for release due to the top-secret matters involved. So I think that his, I mean, his life in the Bureau was nothing but a lie. And for him then to come back from that assignment and be placed in a situation in which he never learned how to be a field agent, I mean, he went straight out of the Academy into the steep undercover assignment. And I don't, while it's not an excuse to say that he didn't know any better, I think that his experience in the first seven years was such that that's how he dealt with it. I mean, he was daily faced with stressful situations while undercover, where he had to react with the lies. While, again, it doesn't excuse it, I think that had the issue been addressed when he first came out of that assignment, perhaps he would have learned to react differently. He would have learned how to deal with the stress. So now that all this has occurred, he really has limited value as a witness. Wouldn't you agree? I'm sorry? Even if he comes out of this and gets proper help, the taint on his record is such that it's going to be very, very difficult for him to take a position with the FBI or he could ever testify in court. Yeah, I agree. I think that probably his best bet would be to perhaps be placed in some type of situation where he could teach about maybe what he learned while his undercover assignment. Hopefully they could take advantage, as they did when he was undercover, of his multiple language skills, his ability to infiltrate foreign gangs and hostile entities. So I think definitely his being in a position where he was forced to testify, that obviously is not going to be in his best interest. But I still think that he could be very useful. If for nothing else, the knowledge that he has, the FBI could certainly benefit from it. I mean, they benefited from it for years while he was undercover. I just think now that they at least owe him the help that he so desperately sought. In supplemental briefing, you agree that apparently with the government that one of the elements of a Rehabilitation Act is that the termination be made solely on the grounds of the disability. How can you maintain that and go forward with your other claims at trial? If you prove that, in other words, that he was discriminated against because of race or nationality, you preclude a Rehabilitation Act claim, wouldn't you agree? I would agree. It may be difficult and it would certainly be something that he would have to decide if he wanted to continue with the other claims. I tend to think, obviously I came in this case very late. I tend to think that the rehabilitation claims are obviously the strongest. And I would certainly, if allowed to continue in this case and if it were remanded, certainly have a discussion with him about which causes might be more viable than others. Continuing on, I think that with regard to the reasonable accommodation, the trial court erred in finding that Mr. Lau failed to present any evidence that had an accommodation been allowed, that it would have been successful. I think this is clear error in that the ADA does not require a plaintiff to show that a reasonable accommodation is going to be successful, only that it is reasonable. The FBI became aware of the need for an accommodation, like I said, as early as 1990. His October 1990 debriefing indicated that he was suffering severe work-related stress. So I think that once they became aware of the need for an accommodation, the duty then arose for them to identify, implement such an accommodation. So the district court erred in holding that there was the burden was on Mr. Lau to show that the accommodation would have been successful. Just a minute. Again, because the FBI realized and recognized the need for an accommodation, and this was done after Mr. Lau had repeatedly requested that his doctors be allowed the proper security clearance to hear his, I guess, problems. He was, in fact, examined by two doctors that the FBI appointed in the wake of the Fitness for Duty examination. Those two doctors both found that he needed to seek treatment for at least three months, possibly six months, with his own psychiatrist or psychologist who was to provide a report back to the FBI. And then at the end of this three-month period, he was to be reevaluated to determine his Fitness for Duty. Now, the FBI argues that it was prepared to make this accommodation, but it claims that it held this action in abeyance pending the outcome of the Office of Professional Responsibility investigation. And we submit that things should have been precisely the opposite, that they should have recognized, or once they recognized the fact that there was a disability, the Office of Professional Responsibility determination should have been held in abeyance until a reasonable accommodation could have been determined. It can't be the case that preparation for a proposal of a reasonable accommodation relieves an employer of the responsibility under the Rehabilitation Act. I mean, if that were the case, employers could terminate employees for their disability-related behavior, and then escape sanction by merely claiming that they were preparing to accommodate. And moreover, as this Court noted in Humphrey, it would be inconsistent with the purposes of the Act to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action that was taken due to the disability sought to be accommodated. Now, the Court has applied a distinction between disability-caused conduct and the disability itself as a cause for termination. And those are in cases involving alcoholism, illegal drugs, and then in cases of egregious and criminal conduct. Now, while the alleged misconduct here, in addition to the lying, as Judge Hawkins noted, was the shoplifting incident, the charges were ultimately dismissed. And I think that such conduct hardly arises to the egregious level, as noted in the Newland opinion wherein the plaintiff attempted to fire an assault rifle into a crowded bar room and described his drunken rampage as a direct result of his alcoholism. I think that the facts in the case are clearly distinguishable. We submit that the, again, the shoplifting incident was directly related to his disability. It had been predicted by those in the FBI years prior that he may again act out if placed in stressful situations. As I said, the charges were ultimately dismissed. Let me ask you this. Sure. Is there any eligibility for disability retirement? Well, that evidence is not in the record before the Court, yes. In fact, that is my understanding an ongoing process at this time. Okay. So if that happens, wouldn't that sort of boot this case? It could possibly, yes. But I don't know. I'm not his attorney in that matter, and I honestly do not have sufficient knowledge to present anything to the Court on that issue. I wouldn't want to misstate the current affair of that disability process. I honestly don't know. Well, that's the first thing that occurred to me, because it's not unusual in a situation involving an employee that has some of these problems to figure out a way to have him retire for disability. Right. I don't know if that was an option or if it was, like I said, I honestly don't know, Your Honor. I just think that in any event, Mr. Law should be allowed his day in court and let a jury of his peers decide whether the FBI properly handled his need for a reasonable accommodation. And I just think that the district court erred in holding that there were no issues of material fact. I think the record is just full of them, even if you consider only the bail letter. I mean, it in and of itself condemns the way the FBI handled this, stated that he should have been given the proper treatment and support. The FBI didn't follow its own procedures in referring him to an employee assistance program or even in responding to his doctor's request for the security clearance in order to address these issues. I just think that Mr. Law certainly deserves his day in court and let a jury of his peers decide. Okay. Thanks. Thank you. May it please the Court, Counsel. My name is Kristen Dorr. I'm an assistant United States attorney in the Eastern District of California, and I represent the Attorney General. Responding to the question about Mr. Law's status on disability, he did retire on an OPM disability retirement several years ago, and earlier this year he was awarded a Department of Labor found that his disabilities were work-related. Mr. Law submitted papers to this Court when he was appearing pro se. I believe it was in January or February. So he is receiving workers' comp benefits. I don't think that issue addresses anything other than the fact that he has a disability. It doesn't prove his Rehabilitation Act claim, but I did want to address that because he is he received disability benefit, disability retirement, and then a workers' comp award. So. So how much does that come to? Pardon? How much does that come to? I don't know. It's my understanding that a workers' comp award is approximately 75 percent of the salary and it's tax-free. But I don't know the dollar amount. What about the retirement? Is that on top of that? I believe if you I don't believe you can receive both. You receive the higher of the two. So he has had a remedy for whatever disability may have been connected to his work as an undercover agent, as an FBI agent. I do want to address a couple points that. I'm sure these situations come up, oh, come up before with the bureau where you have agents that are under stress and they engage in criminal conduct. I'm sure it does, Your Honor. Does they want to get caught? I'm sorry. I couldn't hear the question. Do they want to get caught and they're crying out for help? Well, that may be, Your Honor. But there was no evidence before the district court that Mr. Lau's 1996 shoplifting had anything to do with a disability. There's no evidence in the record what that disability was. There was some mention of post-traumatic stress disorder. That is nowhere in the record, Your Honor. There was no expert testimony explaining or describing what Mr. Lau's mental problems were. In my ---- Well, the district court referenced post-traumatic stress disorder and sleep apnea. I'm sorry, I'm having a ---- The district court cited post-traumatic stress disorder and sleep apnea, right? Well, there was no testimony in the record from any expert. Why is the government conceding disability, then? Well, in conversations with the FBI, they believed that Mr. Lau had personality disorders that have impaired his judgment and impaired his judgment as an FBI agent. And we submitted that testimony in the form of the declaration from Margaret Gray, who was involved in the health programs unit, that was involved in trying to find an accommodation for Mr. Lau. So the FBI has never disputed that he has a disability. What the FBI does dispute is that the FBI terminated him because of his disability, and that is the burden that Mr. Lau is required to show. The FBI terminated Mr. Lau for the simple reason that he violated the bright line policy promulgated by FBI Director Freeh in 1994 that said lying, cheating, and stealing would not be tolerated. And that is the reason Mr. Lau was terminated. I think the Supreme Court ---- What if, what if, what if, what if, you know, stealing was a manifestation of his underlying mental disability? Well, two answers, Your Honor. I think the Supreme Court decision in Raytheon v. Hernandez puts to rest any argument that a criminal conduct that's caused by a disability must be excused by the employer. This Court's decision in Newland and in Humphreys also recognizes there are certain, certain types of conduct that are simply not going to be excused. Well, I'm not saying that it should be excused. I'm just saying it's a symptom of his disability. It may be, Your Honor, but there was no evidence before the district court that there was any link between the shoplifting, trying to bribe the store security officer, lying about the matter in the subsequent OPR investigation, his failure to appear in superior court in response to a bench warrant. There was no evidence of any causal connection, any link between his criminal conduct and his personality disorders. Addressing an issue that was raised in the supplemental brief, Mr. Lau suggests that even under Newland and Humphreys, Mr. Lau's conduct had to be egregious in the nature of something evil and violent. And there's no authority to support that, but I would suggest that when you are dealing with an FBI agent who is a sworn law enforcement officer, who carries a gun, that lying, resisting arrest, failing to appear in response to a lawful court order, and then lying in the subsequent OPR investigation under oath, those are egregious in the context of the job that Mr. Lau was holding at the time. I'm not arguing with you about that. You're right. All I said was that those could well be symptoms of post-traumatic stress disorder. It may be, Your Honor, but there was no expert testimony. Well, there's no expert testimony, but you did have a special agent in an earlier episode who provided, who said in his letter that, or at least in his recommendation against termination, that the prior shoplifting episode was a result of those very factors. Well, the 1990s. There is evidence in the record that the agency considered it to be a result, causally linked, at least the earlier episode. I grant you that there's no expert testimony. Well, I think, Your Honor, there is a big difference between the 1990 episode and the 1996 episode. In 1990, Mr. Lau was in a deep undercover assignment. He had limited contact with other agents. He had limited contact with his family. By 1996, he had been back, he had been assigned from the Chicago office to the Sacramento field office. He was in a regular, everyday FBI agent position. At one point, he was an applicant coordinator. Not at making arrests, he was in a very low-stress position. So you've got a six-year time period between the two shoplifting matters. So while the deep undercover assignment in 1990 was a very stressful episode, the FBI recognized that, and rather than firing him, which they said they would have otherwise done, they recognized those stressors and gave him a 14-day suspension. In contrast, in 1996, those stressors weren't there. Isn't that why they call it post-traumatic stress disorder? Because the stress is no longer yet there, but you're still having the same reaction from it? I mean, all I'm saying is you keep saying there's nothing in the record. But, in fact, the FBI itself earlier said there's a link between stress and what he's doing that's inappropriate. So there is. I grant you there's no expert testimony. But if you accept that as true, then you get back to Judge Pregerson's question about isn't there a link or isn't there arguably a link? Because at this stage, we have to construe the evidence in the light most favorable to the agent. Well, first of all, post-traumatic stress disorder is a psychiatric diagnosis that must be made by an expert. It can't be made by a field agent who decides to give Mr. Lau a break because of stress. So there is no expert testimony putting a label on Mr. Lau's conduct. Well, is there authority that it has to be made by an expert? Well, it's a medical diagnosis, Your Honor. A layperson can't make it. You know, I deal with a lot of homeless veterans, and many of them, most of them, have got post-traumatic stress disorder. And I've gone out with, you know, people that work at the shelters and talked to them. And you talk to these folks for a few minutes or a half hour, and you can see that they're suffering from post-traumatic stress disorder. It doesn't take a lot to figure that out. Well, Your Honor, my response to that would be Mr. Lau was working in a field office until 97 before. Now, even when the stress is gone, even when the stressful situation is gone, it's still worth it. It's still worth it. Well. What do we make of the field office, the health care programs unit assessment of him? They say he was not fit for duty because of some psychological factors. Absolutely. And that was the accommodation that the FBI was in the process of making. Under federal law, an agency can require an employee to submit for a fitness for duty exam. He was examined by a psychiatrist and a psychologist. And that's set forth in Ms. Gray's declaration in the excerpt of the record, or the supplemental excerpt. And while those two professionals, those two, the psychiatrist and the psychologist, found that while there was no major medical or psychiatric disorder, which would include post-traumatic stress disorder, they found that he suffered from personality impairments that did impair or personality disorders that impaired his judgment. And at that point in time, he was unfit to be an agent.  And so the agency was going to give him the accommodation that he requested, which was a leave of absence. And but for his criminal conduct, the shoplifting, the lying, the failure to appear, that process would have gone on. And at the end of the three to six months of treatment, they would have reevaluated whether he was fit to return as an agent. Now, Mr. Lau's attorney has suggested that rather than hold the fitness for duty exam in abeyance, they should have held the OPR investigation in abeyance and awaited the outcome of the therapy. And I would submit to the court that had the FBI done that and gone through the treatment and Mr. Lau had been deemed fit to return to an agent, the FBI still would have had an agent with criminal conduct that they had to deal with. Well, isn't that at the end of the day what we're talking about? I mean, you've conceded disability, although you kind of quibble about it and you quibble about causality. But your central argument is that the Bright Line rule trumps everything. It doesn't matter whether he's disabled or not. It doesn't matter if the conduct is causally related. Absolutely. And their response is that if it's causally related, that the Bright Line rule doesn't trump. Isn't that exactly where we are in this case? I think, Your Honor, that's correct. And I think the Raytheon decision in footnote 6 says to the extent that there's any suggestion that conduct caused by disability has to be excused by the employer, I think Raytheon overrules that. And even if it doesn't, under this Court's decisions in Humphreys and Noland, his conduct was criminal and egregious. So whether it was caused by a disability or not, it's not the kind of conduct that an FBI or that the FBI can tolerate in an agent. He is of limited usefulness. After his first shoplifting, his usefulness as an agent was limited to things like reviewing applicants for FBI positions and some surveillance. But as Judge Hawkins recognized, he can't be a prosecution witness. Certainly if he signed an affidavit for a search warrant, his credibility in a suppression motion would be severely attacked. So in the context of his position as an agent, this was egregious conduct. Right. But then as we carry it one step further, if you treat people whose disabilities do not cause criminal behavior differently from people whose disabilities arguably do, then you might have a Disability Rehabilitation Act claim, right? In other words, you have the same agent, but there's no disability at all. And you have a series of agents that if they aren't diagnosed with any problems, they go out and shoplift identical records and you treat them differently, then you may have a discrimination claim. Isn't that where we are then? And the question of proof is whether you're treating other agents similarly situated differently. Well, I think if an agent with no disability goes out and shoplifts and the FBI fires them. Not fires them. See, that's the difference. If you treated people with identical conduct, who committed identical crimes, engaged in identical conduct differently, if they were not disabled, then a disabled person, then that's the guts of the claim. And I'm not sure you have that anywhere in the record, but that's the second leap to the question of whether or not the policy trumps. Well, that would be if there was evidence in the record that the FBI treated other agents who lie, steal, cheat, in violation of the policy, treated them more favorably, but then fired Mr. Lau, there might be an issue. But there was no evidence in this record of the disciplinary actions taken against other agents. There was no evidence at all. So there was no evidence from which the district court or this court could find that the application of the Bright Line Rule was a pretext for discrimination. Now, the only thing you have is a Whitehurst Declaration, arguably, and then the supplemental material submitted on the difference in types of discipline imposed, right? Those are the only two things that are arguably before the Court. Well, Whitehurst Declaration, as the Court noted, was complete hearsay. There was no foundation for his testimony. I said arguably before. Arguably. Yes, arguably. And then the materials that were submitted with the reply brief, the two Office of Investigation or, excuse me, the Office of Inspector General reports, one was considered by the district court. The 2002 report was one of Mr. Lau's exhibits, and the district court properly rejected it because for two reasons. Well, the main reason was the report did not address any issues of race, national origin, retaliation or disability. That OIG report strictly addressed the question of whether the FBI treated senior management more leniently than line agents. And the report concluded there was not sufficient evidence to reach a conclusion one way or the other. The second report that was submitted postdated the district court's grant of summary judgment, and that report was a follow-up and came to the same conclusion. While there was still a perception in the FBI that senior management was treated more leniently than line agents for similar conduct, excuse me, there was simply not enough evidence to reach a conclusion one way or another. So there is no evidence that was presented to the district court, any admissible evidence that would support his race, ethnicity, disability or retaliation claims. I think what the issue boils down to set forth in the Raytheon case is once the FBI articulated for the district court and for this court that they applied a neutral, nondiscriminatory policy to support their employment decision, their decision to fire Mr. Lowe, the burden shifted to Mr. Lowe to produce evidence that that was a pretext for discrimination. He did not do that. There is no evidence in the record, no evidence that's been pointed out to this court that the application of this policy was ever a pretext for discrimination. And for that reason alone, Mr. Lowe cannot prevail on this appeal. And I think it's also important to point out that all along, Mr. Lowe has argued that the FBI did not consider his disability when they made the decision to fire him. And if that's the case, he certainly can't meet the third element of a prima facie case under the Rehabilitation Act, which says he has to prove that he was terminated because of his disability. He has always said they didn't consider his disability. So that's the nail in the coffin on his Rehabilitation Act claim. One last comment, Your Honor, on the otherwise qualified issue that we submitted on supplemental briefing. I don't think the ñ it really matters whether he can show that he was otherwise qualified or not. Even if he made his prima facie case, we still go back to the legitimate, non-discriminatory, neutral policy that said lying, cheating and stealing cannot be tolerated in an FBI agent. Thank you. Thank you. I'll give you a couple minutes for rebuttal. Okay. Thank you. Just in response to the Raytheon case, I think it's clearly distinguishable. In that case, the employee, I guess, was forced to resign because he tested positive on a cocaine test, continued on a couple of years, reapplied with the company, and they rejected hiring him based on his prior conduct. I think that's completely distinguishable in that it was dealing with illegal drugs, which the ADA has held you're not covered when you are dealing with illegal drug situations. That is certainly not the case here, and I don't think that Raytheon in any way overturns the Humphrey decision out of this court. With regard to the OIG report, the second one or the first one, I know the first one was rejected by the district court. The second one I think this court can take judicial notice of, as was done with the Christopher Commission report and the Blair v. Pomona decision. If nothing else, I realize, and I don't disagree with Ms. Doar's position, that they found, and the purpose of the study was the disparity in treatment between senior agents and field agents. I think there's still evidence there from which a jury could have concluded that agents were treated differently. Finally, in responding to the argument that there was such a length of time between the first shoplifting event, the undercover situation, and then the second shoplifting incident, I think it's unique in that the FBI was fully aware of the prior criminal conduct. They found that because it was directly related to the stress that he was suffering, they determined that he would not be fired, again, would be disciplined for the 14 days, but yet would not be terminated. So for the FBI now to argue that he should be terminated because he's repeated the same conduct, Mr. Lau's SALT treatment in those five years between the incident, it was never provided to him. He was never referred to an employee assistance program. And I mean, I think this Court is aware that it is a continuing symptom that he was suffering from, whether or not we had a doctor report say that he was suffering from post-traumatic stress disorder. I mean, the FBI was fully aware of it. There were three different memos and or letters in the record before this Court that indicate he was suffering from this ongoing stress and that he could, in fact, exhibit such behavior later on. So I think it's somewhat circular for them to argue that he was fired for violating the bright line policy when, in fact, the acts that violated the bright line policy were directly related and attributed to the job stress that he was suffering. I don't think that employees should be punished for that when, in fact, he had made every reasonable request for such an accommodation that was continually denied. And it just leaves him in a position that is, I think, ultimately unfair. Again, I would just ask that this Court look at all of the fact issues that were presented. Pay close attention to the veil report. I think it's very telling on how this case was handled. And I would request that the Court remand this case to the district court and allow Mr. Law his day in court. Thank you for your time and appreciate being able to present this. And thank both of you and the panel does. Recess tomorrow morning at 9 a.m. Thank you. Thank you.
judges: Pregerson, Hawkins, Thomas